UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GWENDOLYN JACKSON, | ) | |
| CALVIN TOWNSEND, | ) | No. 08 CR 453 |
| LATONJA SPENCER, | ) | |
| BUFORD PETEET, | ) | Judge James B. Zagel |
| JEAN HERNAL, | ) | |
| EDGARDO HERNAL, and | ) | |
| BOZIDAR KELIC | ) | |
| | ) | |

## CASE STATUS MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully submits this memorandum summarizing the status of this case.

## Introduction

This memorandum is submitted at the Court's request to provide a summary of the status of this reassigned fraud case and focuses on the evidence against and the preliminary guideline calculations for the remaining defendants.

## Procedural Background

This case concerns a mortgage fraud scheme in which Bobbie Brown and 33 other co-schemers used nominees to purchase properties in both the Chicago and Las Vegas areas at inflated prices in transactions financed with approximately 150 fraudulently obtained mortgage loans that totaled approximately $95 million. Although certain co-schemers participated in fraud involving

both Chicago and Las Vegas properties, to make the trial more manageable, the scheme was charge in two companion cases. One case, assigned to Judge Kendall (08 CR 452), has 13 defendants and concerned the fraud involving the Las Vegas Area properties. All 13 of those defendants have been convicted, 12 as a result of guilty pleas and one after a jury trial. This case, originally assigned to Judge Andersen and now to this Court, has 21 defendants and concerned the fraud involving the Chicago area properties. Fourteen of the 21 defendants have pleaded guilty, leaving defendants GWENDOLYN JACKSON, CALVIN TOWNSEND, LATONJA SPENCER, BUFORD PETEET, JEAN HERNAL, EDGARDO HERNAL and BOZIDAR KELIC. [1]  The government expects that the trial in this case will last 3 weeks.[2]

### Overview of the Chicago Scheme

Beginning  in about August 2004, GWENDOLYN  JACKSON, CALVIN TOWNSEND, Bobbie Brown, Barry Adams, and  Leslie Love recruited individuals to be nominee purchasers of multiple properties.  The nominees, including BURFORD PETEET, BODIZAR KELIC, JEAN HERNAL and EDGARDO HERNAL, knowingly signed loan applications containing multiple false statements to finance the purchases. In return, the nominees received kickbacks ranging from approximately $10,000 to $20,000 per property purchased from JACKSON, TOWNSEND and Brown.

---

[1] Only lead defendant Bobby Brown was charged in both cases. He has pleaded guilty in both and awaits sentencing before Judge Kendall. In the following discussion, the names of defendants awaiting trial are in all capitals. Unless otherwise indicated, the individuals named in initial capitals are defendants who have pleaded guilty or been convicted.

[2] This estimate is contingent upon the multiple defendants stipulating to the admission as business records of the loan files and title company files as to their respective transactions.

TOWNSEND, JACKSON, and Brown referred the nominees to loan officer co-schemers, including SPENCER, Thurman, Ellington, Sloan, Harris and Moscato, who knowingly prepared and submitted fraudulent loan applications on behalf of the nominees. These loan officers also obtained false documents to support the false statements in the loan applications. The false documents included false verifications of rent ("VORs"), false leases, false construction receipts, false verification of employment ("VOEs") and false verifications of deposits ("VODs"). Chase Bank employees Tracy Green and Jotawn Draper provided false VODs inflating the amounts the nominees had on deposit at Chase Bank. Additionally, Carolyn Thompson and Donald Felton, accountants and tax preparers, provided a false tax/accountant letters required by lenders to approve the loans of a self-employed nominee.

At the loan closings, attorney co-schemer DeFourneau represented nominees, including KELIC and PETEET, knowing that the loans were fraudulently obtained. Finally, JACKSON, TOWNSEND and Brown provided funds that were falsely represented to be the nominees' down payments.

The Chicago co-schemers fraudulently obtained approximately 133 loans that totaled approximately $82 million, causing a total loss to the lenders of approximately $32 million. The roles of and evidence against each of the remaining seven defendants, the losses associated with their fraudulent transactions, and their preliminary guideline calculations are set forth below.

**Gwendolyn Jackson**

JACKSON recruited nominees, referred the nominees to co-schemer loan officers and disbursed funds to execute the scheme, including paying the nominees. Several nominees including

3

Michael Taylor, Marilyn Claiborne, Sherry Collins, and Aleshia Hushaw will testify that JACKSON recruited them to be nominees to purchase properties as part of the scheme, referred them to various loan officers and paid them for acting as nominee buyers.

Loan officer co-defendant Wayne Harris will testify that JACKSON referred numerous nominees to him in order to obtain fraudulently obtain mortgage loans. In particular, Harris will testify that JACKSON paid him $5,000 in cash as an undisclosed kickback to fraudulently obtain funding for nominee buyer, Marilyn Claiborne. Harris will further testify that JACKSON had nominee buyers falsely claim that they were going to occupy the properties and that JACKSON was also aware that Brown had the nominees do the same thing in order to close the transaction. Co-defendant Brandon Ellington and Jacinta Johnson will also testify that JACKSON paid them undisclosed kickbacks as loan officers to obtain fraudulent mortgage loans for nominees.

Barry Adams will testify that JACKSON negotiated with home builders for the nominees' purchase of properties and recruited nominees to purchase these properties. Adams will also testify that he observed JACKSON creating false real estate contracts for nominee buyers.

Corporate filings show that JACKSON was the president of Chicago Global Investments ("Chicago Global"), a sham business set up by Brown and JACKSON to facilitate payments to execute the scheme. Bank records show that JACKSON was the authorized signatory on the Chicago Global account and wrote checks from the Chicago Global account to pay kick-backs to nominees, recruiters of nominees, and loan officers, as well as for closing costs for the fraudulently obtained mortgage loans. The bank records and real estate records also show that JACKSON received approximately $23,000 in "finder fees" for recruiting nominees to purchase property with

4

fraudulently obtained mortgage loans, as well as withdrawing another $74,000 in cash from the Chicago Global accounts.

JACKSON participated in approximately 18 fraudulent loan transactions totaling approximately $8,432,800. The loss amount to date on the 18 properties is approximately $2,017,900. Based upon her role as a leader/organizer, the government calculates her adjusted offense level at 27. With a Criminal History Category of I, JACKSON's advisory guideline range is 70 to 87 months.

### Calvin Townsend

TOWNSEND, a real estate agent, recruited nominees and negotiated with sellers to inflate sales prices to facilitate kickbacks. Four nominees will testify that TOWNSEND recruited them to purchase property as part of the scheme and paid them for being nominees. TOWNSEND further told the nominees that they would not have to live in the property, although the loan documents falsely claimed otherwise. In one such transaction, TOWNSEND himself moved into the property, valued at $1 million, and did not make mortgage payments.

TOWNSEND has admitted that he negotiated with home builders to have a portion of the sales price kicked-back to Brown and TOWNSEND in return for finding the nominee purchasers and that he shared commissions with Love that were not disclosed on the HUD-1. TOWNSEND has also admitted knowing that the nominees that he recruited into the scheme for Brown were paid kick-backs from the loan proceeds and that the payments were not disclosed to the lenders or on the HUD-1s.

TOWNSEND also recruited several nominee buyers for his own fraudulent transactions, and like Brown, paid kick-backs to the nominees. TOWNSEND then referred his nominees to 2 loan officers involved in the scheme, Ellington and SPENCER. The evidence shows that Ellington fraudulently obtained approximately 9 loans for TOWNSEND's nominees, while SPENCER fraudulently obtained approximately 8 loans for TOWNSEND's nominees.

TOWNSEND participated in approximately 22 transactions with a total loan amount of $16,194, 800. The loss amount to date on the 22 properties is approximately $6,248,450. TOWNSEND received $1,594,219 in real estate commissions from the fraudulent deals. Based upon his role as a realtor and leader/organizer, the government calculates his adjusted offense level at 31. With a Criminal History Category of I, TOWNSEND's advisory guideline range is 108 to 135 months.

### Latonja Spencer

SPENCER was a licensed loan officer who fraudulently obtained loans for nominees recruited by Brown and Townsend. At least 4 nominees will testify that SPENCER was their loan officer and they that they provided accurate income information to SPENCER and told her that they did not intend to live in the properties. The loan applications SPENCER prepared inflated the nominees' incomes and falsely represented that the nominees intended to occupy the properties. SPENCER's own files (broker files) contain W-2s showing some of the nominees actual incomes, and she has admitted that she routinely inflated the income of the nominees in order to obtain funding from the lenders, and that the documents falsely represented that the nominees intended to

occupy the property. SPENCER received approximately $37,000 in commissions on the fraudulent loans she obtained.

SPENCER participated in approximately 11 fraudulent transactions with a total loan amount of $7,720,900. The loss amount to date on the 10 properties is approximately $3,021,550. Based upon her role as a licensed loan officer, the government calculates her adjusted offense level at 29. With a Criminal History Category of I, SPENCER's advisory guideline range is 87 to 108 months.

### Buford Peteet

Within approximately 4 months, PETEET was the nominee purchaser of 10 properties in the Chicago and Las Vegas schemes by fraudulently obtaining loans totaling approximately $5,140,800. PETEET purchased several of the properties within days of each other and 2 properties on the same day. The loan applications PETEET signed to get the 10 loans contained numerous false representations, including intent to occupy the properties, false employment and inflated income, and concealed from the lenders his multiple purchases and liabilities. They were also supported by multiple false documents, including false leases, false VOEs and false VODs.

PETEET testified before the grand jury, admitting that he was a nominee purchaser of these properties, that for at least one of his purchases he signed a loan and closing documents which he knew falsely claimed he was going to reside in the property being purchased, that he was paid approximately $35,000 by Brown in return for fraudulently obtaining the loans, and that he was referred to several co-schemer loan officers by Brown.

Shalonda Sloan will testify that she was a loan officer who obtained funding for PETEET. Sloan will testify that she prepared loan documents for PETEET which falsely stated that he worked

for Brown's company, B&M Custom Homes, inflated his income and falsely stated that PETEET would occupy the properties. Sloan will testify that PETEET was aware of the false information on his loan documents and nonetheless signed the false documents.

Based upon his role as a nominee buyer, the government calculates PETEET's adjusted offense level at 27. With a Criminal History Category of I, PETEET's advisory guideline range is 70 to 87 months.

### Bodizar Kelic

Within about 10 weeks, KELIC was the nominee purchaser of 7 properties by fraudulently obtaining loans totaling approximately $5,968,500. Brown referred KELIC to several loan officers, including co-defendants Harris, Thurman and Moscato. KELIC completed 2 transaction with each of these loan officers in the 10 week period. Several loan officers will testify to KELIC's knowledge of the false statements, including inflated income and false occupancy statements, which KELIC made in the loan applications in order to obtain the loans. In return for fraudulently obtaining the loans, KELIC received at least $30,000 in kick-backs.

The loss amount to date on the 7 properties is approximately $2,106,813. Based upon his role as a nominee buyer, the government calculates KELIC's adjusted offense level at 25. With a Criminal History Category of I, KELIC's advisory guideline range is 57-71 months.

### Jean Hernal and Edgardo Hernal

Within six weeks, JEAN and EDGARDO HERNAL fraudulently obtained loans totaling $3,087,070 so that they could be nominee purchasers of 4 properties, one by EDGARDO HERNAL, the others by JEAN HERNAL. EDGARDO purchased his property for $890,000 on August 31,

8

2006, while JEAN purchased her first property for $835,000 on the same day. JEAN then purchased a property 2 weeks later for $934,000 and the final property a month later for $450,600. Although the HERNALs lived in a residence in Westchester, each property that they purchased was bought by making false statements on their loan application, including inflating their incomes and representing that all but one of the properties would be their "primary" residence. In return for fraudulently obtaining the loans, the HERNALs received kick-backs totaling $101,000. Loan officer Wayne Harris will testify to the HERNALs' knowledge of the false statements, including inflated income and false occupancy statements, which the HERNALs' made in the loan applications in order to obtain the loans.

The loss amount to date on the 4 properties is approximately $1,179,570. Based upon the HERNALs' role as nominee buyers, the government calculates each as an adjusted offense level of 23. With a Criminal History Category of I, each has an advisory guideline range of 46-57 months.

Dated: November 18, 2010

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: /s/ Daniel E. May
    DANIEL E. MAY
    BRIAN NETOLS
    ERIKA L. CSICSILA
    Assistant United States Attorneys
    219 South Dearborn Street
    Chicago, Illinois  60604
    (312) 353-8694